AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Pennsylvania

**FILED**
**WILLIAMSPORT**

JAN 0 5 2023

PER_____C A W_____
**DEPUTY CLERK**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

SAMSUNG GALAXY S10+ CELL PHONE MODEL
SM-G975U

)
)
)
)
)
)

Case No. 4:23-MC-00015

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*   SAMSUNG GALAXY S10+ CELL PHONE MODEL SM-G975U

located in the _____Middle_____ District of _____Pennsylvania_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC section 846 | Conspiracy to manufacture, distribute, and possess with intent to distribute a controlled substance, and Attempted possession with intent to distribute a controlled substance. |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Timothy K. O'Malley, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 01/05/23

*Judge's signature*

City and state: Williamsport, Pennsylvania

William I. Arbuckle, United States Magistrate Judge
*Printed name and title*

FILED
WILLIAMSPORT

JAN 05 2023

PER _____ C.M.W

DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF: A
SAMSUNG GALAXY S10+ CELL PHONE
MODEL SM-G975U.

Case No. *4:23-MC-00015*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Timothy K. O'Malley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation, and, as such, am an investigative or law enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am engaged in the enforcement of criminal laws and am within a category of officers authorized by the Attorney General to request and execute search warrants pursuant to Title 18, U.S.C., Sections 3052 and 3107; and DOJ regulations set forth at Title 28, C.F.R., Sections 0.85 and 60.2(a). I have been so employed for over 18 years. I was previously employed for three years as a police officer with the United States Secret Service, Uniformed Division. I am assigned to the FBI's Philadelphia Division at the Williamsport Resident Agency, Williamsport, Pennsylvania. I am currently assigned to investigate violent crimes, crimes on government reservations, and complex financial crimes. I have received extensive training in methods of proof utilized in

the investigation and prosecution of federal crimes. I have conducted and participated in the conduct of hundreds of investigations. In the course of my official duties as a Special Agent, I have executed and participated in the execution of numerous federal search warrants.

**3.** The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents and from other law enforcement officers, information obtained from witnesses, subpoenaed records, search warrants, and subject interviews. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this case.

4. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of a violation of Title 21, U.S.C. Section 846, conspiracy and attempted possession with intent to distribute controlled substances, and 18 U.S.C. § 2, will be located through an examination of the device described herein.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is a Samsung Galaxy S10+ cell phone Model SM-G975U. This device was seized by the FBI on June 15, 2019 pursuant to a federal search warrant issued in the Northern District of Ohio. The property to be searched was seized from a Nissan Armada vehicle operated by DAMONICO HENDERSON on that date.

6. The applied-for warrant would authorize a forensic examination of the device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

7. On June 15, 2019, Damonico L. Henderson, driving a grey 2019 Nissan Armada
Sport Utility Vehicle (SUV) bearing Ohio tag HFF7028, and an individual later identified as
Ruben Garcia, driving a black colored 2006 Ford F-250 pickup truck with tan trim, bearing
Ohio tag HFP4779, travelled from Henderson's residence at 353 Pemberton Drive, Elyria,
Ohio to a shopping center in Hermitage, Pennsylvania. Damonico Henderson rented this
Nissan Armada from June 14, 2019 to June 16, 2019. The purpose of this trip was for
Henderson to meet with Anthony Bressi in the parking lot of the Lowe's store in Hermitage.
Days prior to this trip, Henderson and Bressi finalized the meeting time and location at the
Lowe's store in Hermitage, Pennsylvania by SMS text messages. The purpose of this
prearranged meeting was for Henderson to take possession of a quantity of carfentanil (a
Schedule II controlled substance) mixed with lactose from Bressi.

8. Unbeknownst to Henderson and Garcia, at the time Bressi was acting as a
Cooperating Witness (CW) for the FBI. The carfentanil-filled buckets Henderson expected
to receive were replaced by look-alike buckets containing only lactose. From the time of
their departure from Henderson's home, throughout their travel to Pennsylvania and back,
Henderson and Garcia were kept under physical surveillance by Agents and Task Force
Officers of the FBI. Additionally, the meeting between Henderson and Bressi in the Lowe's
parking lot in Hermitage, Pennsylvania was observed, monitored, and recorded by the FBI.

9. Henderson and Garcia travelled from Elyria, Ohio to Hermitage, Pennsylvania
primarily via the Ohio Turnpike/Interstate 80. As they neared Hermitage, Pennsylvania
Garcia pulled off at an exit while Henderson continued on to the Lowe's store parking lot in
Hermitage, Pennsylvania to meet with Bressi as planned. Henderson met with Bressi in the

3

Lowe's parking lot and took possession of 10 white five-gallon buckets filled with lactose. Henderson and Bressi loaded the buckets into Henderson's rented vehicle. Henderson departed from the Lowe's parking lot and travelled to a Dunkin Doughnuts parking lot in Hubbard, Ohio where Garcia was waiting.   Henderson and Garcia transferred the ten five gallon buckets from Henderson's vehicle into Garcia's pickup truck. Henderson and Garcia then resumed their travel westbound on the Ohio Turnpike back to Elyria.

10.     Henderson's and Garcia's return travel took them back to Henderson's residential neighborhood. As they approached Henderson's neighborhood, FBI personnel conducting surveillance of the two men and their vehicles were assisted by Ohio State Highway Patrol Troopers in conducting a traffic stop. Both men were taken into custody by Agents at the traffic stop. They were then transported to the Elyria Police Department. Their vehicles were towed to the Elyria Police Department.

11.     At the Elyria Police Department, FBI Special Agent Casey Carty and Detective Mike Walker interviewed Henderson and Garcia. At the outset of their respective interviews, both men were advised of their rights pursuant to *Miranda*. Garcia and Henderson indicated they understood their rights. Garcia agreed to speak with Special Agent Carty and Detective Walker but refused to sign the FD-395 Advice of Rights form.

12.     In summary, Garcia provided the following information during his interview:  Henderson and Garcia were lifelong friends. On or about June 12, 2019, Henderson contacted Garcia to ask him to travel to Pennsylvania with him to pick up a load of what Henderson identified as stolen paint. Henderson asked Garcia to follow Henderson in Garcia's pick-up truck and offered to pay Garcia $500 for his trouble. Henderson told Garcia what they were going to pick up was "hot". Henderson told Garcia that he wasn't

4

sure how much of what they were going to pick up would fit in his own vehicle therefore he needed the assistance of Garcia and Garcia's truck.  Henderson called Garcia again on or about June 14, 2019 to discuss the plan.  Henderson and Garcia drove from Henderson's residence to Pennsylvania in separate vehicles, and Garcia stopped one highway exit short of their final destination as instructed by Henderson.  Henderson continued on, telling Garcia he would be "meeting his dude at Lowe's."  Henderson later returned to Garcia's location where he transferred buckets from his vehicle into Garcia's vehicle. They then set out on the return leg of their trip.  Garcia told investigators that this was the first such trip he made with Henderson.  Garcia denied any involvement in the trafficking of controlled substances.  Henderson and Garcia talked on the phone and exchanged text messages regarding this trip to Pennsylvania.  During this interview, Garcia provided consent for the FBI to conduct a search of his pick-up truck.

13.      On 6/15/2019, Special Agent Carty and other FBI personnel searched Garcia's truck at the Elyria Police Department. The 10 white five-gallon buckets Bressi delivered to Henderson in the Lowe's parking lot were located and seized from Garcia's truck.

14.      On 06/15/2019, Special Agent Carty located and seized two Samsung cellular telephones from the passenger compartment of the Nissan Armada operated by Henderson.   One cellular telephone is a Samsung J3.   FBI Cleveland successfully conducted a forensic extraction of the Samsung J3 cellular telephone.  The other cellular telephone, the property to be searched, is a Samsung Galaxy S10+ Model SM-G975U.  FBI Cleveland was unable to unlock this device to perform a forensic extraction.

15.      On or about 06/21/2019, Special Agent Carty submitted a request to the FBI's Electronic Device Analysis Unit (EDAU) Mobile Device Unlock Service (MDUS). Special Agent Carty requested EDAU assistance unlocking this cellular telephone.   On or about February 6, 2020, EDAU notified FBI Cleveland that EDAU may have the capability to unlock/decrypt this cellular telephone.

16.      On or about March 5, 2020, FBI Cleveland shipped this cellular telephone and other evidence seized from Henderson and from Henderson's home to FBI Philadelphia. On May 27, 2020, Special Agent O'Malley submitted a new request for this cellular telephone to MDUS.   Due to processing backlog, EDAU notified Special O'Malley not to submit this device until contacted by someone from MDUS.

17.      On 06/15/2020, Special Agent O'Malley applied for a search warrant in the Middle District of Pennsylvania authorizing the forensic search of this cellular telephone and other electronic devices seized from Henderson and from Henderson's home.   On 06/15/2020, United States Magistrate Judge William I. Arbuckle signed search warrant 4:20-mc-00342 authorizing the forensic search of this cellular telephone and other electronic devices seized from Henderson and from Henderson's home.

18.      On November 16, 2020, MDUS notified Special Agent O'Malley that the MDUS request had been allocated to the Philadelphia Regional Computer Forensic Laboratory (RCFL).   On 11/16/2020, Special Agent O'Malley submitted a RCFL Service Request for Mobile Device Unlock Service of the Samsung Galaxy cellular telephone and shipped the device to the Philadelphia RCFL.

19.      From 11/30/2020 to 12/03/2020, Philadelphia RCFL examiner James McDonald attempted to conduct a forensic examination of the Samsung Galaxy cellular

telephone. The tools used by the RCFL at that time were unable to unlock the phone. The RCFL was only able to conduct a partial extraction of the phone and to conduct extractions of the SIM card and SD card contained within the phone. The extraction identified the Device User as Damonico Henderson, a Sprint SIM card for phone number (440)452-3391, and a phone activation date of 04/28/2019.

20.     On 12/12/2022, writer contacted the Philadelphia RCFL to determine if the RCFL had new tools that may be able to unlock this cellular telephone. Examiner McDonald informed Special Agent O'Malley that the RCFL has better forensic tools today than it did two years ago. Examiner McDonald informed Special Agent O'Malley that, while he cannot guarantee that the RCFL can unlock the phone, he is fairly certain that the forensic tools currently used by the RCFL can unlock and decrypt the phone. Examiner McDonald further informed Special Agent O'Malley that the current tools used by the RCFL have successfully unlocked newer Samsung cellular telephones like the Samsung S22.

21.     Henderson met with Bressi on multiple occasions prior to June 15, 2019 for the purpose of buying bulk amounts of fentanyl analogues from Bressi and for the purpose of making payments to Bressi for the fentanyl analogues. Henderson utilized several cellular telephones to communicate with Bressi prior to the inception of this investigation and during this investigation. Henderson and Bressi used cellular telephones to coordinate dates, times, and meeting locations for the deliveries of bulk amounts of fentanyl analogues and to coordinate dates, times, and meeting locations for Henderson to make payments to Bressi for bulk amounts of fentanyl Bressi fronted to Henderson.

22.        Your affiant is aware through training and communication with other law enforcement personnel that when transporting narcotics on interstate highways, drug traffickers often employ the use of a second vehicle.  The use of one or more vehicles by drug traffickers, for example, allows one vehicle to act as a spotter for police or other potential threats to their illicit cargo. Here, the estimated value of the product delivered to Henderson and Garcia (were it actual carfentanil) was $25,000 per kilogram or $2.5 million dollars in total.  Your affiant believes that it is a reasonable inference that Damonico Henderson communicated with Ruben Garcia by phone before and during the June 15, 2019 trip.   Notably, Garcia admitted to communicating with Henderson by phone and text message when he was interviewed on June 15, 2019.   Your affiant believes the subject device may contain evidence of Henderson's communications with Garcia, evidence of Henderson's communications with Bressi, and evidence of Henderson's communications with other unknown confederates.

23.        I am aware that individuals engaged in drug trafficking maintain voice contact with drug suppliers, partners, and customers via one or more cellular telephone accounts.  Maintaining multiple telephone accounts allows drug traffickers to designate one number for use by their customer base, and another for use by suppliers and close associates. The use of multiple phone accounts is intended to thwart law enforcement efforts to fully identify a drug trafficker's network of criminal associates by ensuring that if one account is compromised by law enforcement, it alone will not reveal the scope of a drug trafficker's criminal activity.  Drug traffickers also make use of the text messaging services afforded by cellular telephones for a quick, simple and reliable means of communication.

8

Records of both voice contacts and text messages are often stored in a cellular phone's memory, even after a user has taken steps to delete the records.

24.     The device is currently in the lawful possession of the FBI.  The device came into the FBI's possession on June 15, 2019 when the device was lawfully seized from Henderson's rented Nissan Armada vehicle.  While the FBI may already have the necessary authority to forensically examine the device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the device will comply with the Fourth Amendment and other applicable laws.

25.     The device is currently in secure storage with the FBI.  In my training and experience, I know that the device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the device was seized by the FBI on June 15, 2019.

## TECHNICAL TERMS

26.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address

9

books;" sending, receiving, and storing text messages and e-mails; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

11

f.      Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.      Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12

27.     Based on my training, experience, and research, I know that the device has capabilities that allow them to serve as a wireless telephone, a digital camera, a GPS navigation device, a portable media player, and a personals digital assistant. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

29.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and where and when they were used. There is probable cause to believe that this forensic electronic evidence may be on the device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

30.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

13

many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31.      *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

32.      Based on the preceding, I believe that evidence, fruits, and instrumentalities of a violation of Title 21, U.S.C. Section 846, conspiracy and attempted possession with intent to distribute a controlled substance, and 18 U.S.C. § 2, will be located through an examination of the device.

Respectfully submitted,

Timothy K. O'Malley
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on January 05, 2023

William I. Arbuckle
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

The property to be searched is:   a Samsung Galaxy S10+ cellular phone, Model SM-

G975U, seized by the FBI on June 15, 2019.

## ATTACHMENT B

1. All records on the Device described in Attachment A that relate to a violation of Title 21 U.S.C. Section 846 :

    a. All records and other information relating to use of the Device in furtherance of distribution of illegal narcotics; and

    b. Evidence of user attribution showing who used or owned the Devices up to, and at, the time of its recovery as described herein; and

    c. As used above, the terms "records" and "information" include all items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.